UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RICCO RAY TORRES, Administrator of the
Estate of Cindy M. Golden and as Parent
and Natural Guardian of A.T., an infant
under the age of 10 years, and JOSEPH
BUMBOLO, Administrator of the Estate of
Michele Bumbolo and Administrator of the
Estate of Michael Bumbolo,

                Consolidated Plaintiffs,

                -v-

FAXTON ST. LUKES HEALTHCARE, also
known as Mohawk Valley Health System,
LINGAPPA S. AMERNATH, M.D., JOHN
DOE, M.D., (a fictional name more
fully described herein), ADIRONDACK
EMERGENCY ASSOCIATES, KAREN
BROWN, C.S.W., LESLIE CONGDON,
R.N., ALONAH SPOOR, Nursing Assistant/
Care Attendant, MICHELLE BLANCHARD,
R.N., SECURITAS SECURITY SERVICES
USA, INC., THE CITY OF UTICA, NEW
YORK, THE CITY OF UTICA, as the
operator of The City of Utica Police
Department, CITY OF UTICA FIRE
DEPARTMENT EMERGENCY MEDICAL
SERVICES, OFFICER JAMES W. GRAEFF,
OFFICER JACOB PENREE, OFFICER
DZEVAD BAJREKTAREVIC,[1] LT. BRIAN
BANSER, OFFICER SERIF SEFERAGIC,
OFFICER MAYNARD ANKEN, SGT. JOHN
ABLE, ADRIAN IRIZARRY, BRIAN
DEVINS, and JAMES ROE, a fictional name
more fully described herein,

                Consolidated Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6:16-CV-439 (LEAD)
6:16-CV-441 (MEMBER)
6:16-CV-449 (MEMBER)

---

[1] The Clerk of the Court is directed to amend the caption as set forth above.

APPEARANCES:                                    OF COUNSEL:

OFFICE OF ROBERT F. JULIAN              ROBERT F. JULIAN, ESQ.
Attorneys for Plaintiffs                           STEPHANIE A. PALMER, ESQ.
2037 Genesee Street
Utica, NY 13501

NAPIERSKI, VANDENBURGH LAW FIRM      CHRISTINE M. NAPIERSKI, ESQ.
Attorneys for Defendants Faxton St. Luke's    DIANE LUFKIN SCHILLING, ESQ.
    Healthcare, Karen Brown, Leslie Congdon,
    Alonah Spoor, and Michelle Blanchard
296 Washington Avenue Extension
Albany, NY 12203

MARTIN, GANOTIS LAW FIRM               CHRISTIAN T. PAYNE, ESQ.
Attorneys for Defendant Lingappa S. Amernath   DANIEL P. LARABY, ESQ.
5790 Widewaters Parkway
Syracuse, NY 13214

GOLDBERG, SEGALLA LAW FIRM             AARON M. SCHIFFRIK, ESQ.
Attorneys for Defendant Securitas Security
    Services USA, Inc.
5786 Widewaters Parkway
Syracuse, NY 13214

CITY OF UTICA CORPORATION COUNSEL      ZACHARY C. OREN, ESQ.
Attorneys for Defendants the City of Utica,
    New York, Officer James W. Graeff,
    Officer Jacob Penree, Officer Dzevad
    Bajrektarevic, Lt. Brian Banser, Officer
    Serif Seferagic, Officer Maynard Anken,
    and Sgt. John Able
1 Kennedy Plaza, 2nd Floor
Utica, NY 13502

PETRONE, PETRONE LAW FIRM              MARK O. CHIECO, ESQ.
Attorneys for Defendants City of Utica Fire
    Department Emergency Medical Services,
    Adrian Irizarry, and Brian Devins
1624 Genesee Street
Utica, NY 13502

DAVID N. HURD
United States District Judge

# TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

        A.      Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5
                1.      Municipal Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5
                2.      Medical Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5
                3.      Security Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

        B.      Causes of Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

        C.      Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

II.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7

III.    LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

IV.     DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

        A.      Municipal Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15
                1.      Section 1983 & Substantive Due Process. . . . . . . . . . . . . . . . . . . .     15
                        i.      Police Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17
                        ii.     EMS Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25
                2.      Negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25
                        i.      Police Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     28
                        ii.     EMS Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     30

        B.      Medical Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     31
                1.      Duty of Care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     31
                        i.      Dr. Amernath. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     32
                        ii.     Hospital Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     39
                2.      Intervening Intentional Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     42
                3.      Indispensability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     43

        C.      Security Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     45

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     46

### MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

In the early afternoon hours of January 6, 2015, police responded to a report that two men were fighting on the porch of the Bumbolo family home.  When officers arrived at the scene, they observed Paul Bumbolo ("Paul") acting strangely and learned that he suffered from a mental illness.  Family members also explained to police that Paul had become increasingly violent over the course of the day, first harming the family's dog before attacking his aunt and beating up his uncle.  During these interviews with the family, Paul attacked his uncle again and officers were forced to physically separate the two of them.  The police detained Paul and directed other first responders to transport him to a local hospital for a mental health evaluation, where he continued to behave erratically for several hours before being discharged later that evening.  Paul then returned home, where he violently murdered his sister Cindy Golden ("Cindy"), his uncle Michael Bumbolo ("Michael"), and his aunt and adoptive mother Michele Bumbolo ("Michele").

In early April 2016, plaintiff Rico Ray Torres ("Torres"), administrator of Cindy's estate and the parent of her infant daughter, and plaintiff Joseph Bumbolo ("Joseph"), administrator of the estates of Michele and Michael, initially filed these three lawsuits in Oneida County Supreme Court seeking damages from the police, first responders, and medical professionals involved in the events leading up to Paul's violent crimes.

On April 18, 2016, the police and first responders removed all three cases to federal court on the basis of federal-question jurisdiction.  Although each pleading filed by Torres and Joseph (collectively "plaintiffs") runs to over one hundred pages, asserts twenty causes of action, and names twenty-two defendants, the factual allegations in each complaint are

largely indistinguishable from each other and therefore the cases have been consolidated under Federal Rule of Civil Procedure ("Rule") 42(a).

### A. Defendants

Broadly speaking, the named defendants fall into three categories:  (1) the municipal defendants who first came into contact with Paul (2) the medical defendants who were later responsible for Paul's evaluation and discharge; and (3) the security defendants contractually responsible for providing security services at the hospital's ER.

### 1. Municipal Defendants

The municipal defendants include the City of Utica (the "City"), the City's Police Department ("UPD"), and seven UPD members:  James W. Graeff ("Officer Graeff"), Jacob Penree ("Officer Penree"), Dzevad Bajrektarevic ("Officer Bajrektarevic"), Brian Banser ("Lieutenant Banser"), Serif Seferagic ("Officer Seferagic"), Maynard Anken ("Officer Anken"), and John Able ("Sergeant Able") (collectively the "police defendants").

The municipal defendants also include the City Fire Department's division of Emergency Medical Services ("EMS"), EMS Technician Adrian Irizzary ("Tech Irizzary"), and EMS Technician Brian Devins ("Tech Devins") (collectively the "EMS defendants").

### 2. Medical Defendants

The medical defendants include Faxton St. Luke's Healthcare System (the "hospital"), Certified Social Worker Karen Brown ("CSW Brown"), Registered Nurse Michele Blanchard ("RN Blanchard"), Registered Nurse Leslie Congdon ("RN Congdon"), and Nursing Assistant Alonah Spoor ("Assistant Spoor") (collectively the "hospital defendants").

The medical defendants also include Adirondack Emergency Associates ("Adirondack"), the physician's practice group that contracted with the hospital to provide the

services of Lingappa Amernath, M.D. ("Dr. Amernath") and a John Doe, M.D. ("Dr. Doe") present in the emergency room ("ER") on the night in question (collectively the "physician defendants").

### 3. Security Defendants

Finally, the security defendants include Securitas Security Services USA, Inc., the hospital's security services contractor, and its unidentified employee James Roe ("Security Guard Roe") (collectively the "security defendants").

### B. Causes of Action

The first sixteen causes of action set forth in these complaints assert state law claims for negligence, medical malpractice, wrongful death, and conscious pain and suffering against the medical and security defendants.  The final four causes of action in each pleading assert state law claims for negligence as well as claims under 42 U.S.C. § 1983 for violations of substantive due process against the municipal defendants.

### C. Motions

The police, EMS, hospital, and security defendants as well as Dr. Amernath (collectively "defendants") have each filed pre-answer motions seeking dismissal pursuant to Rule 12(b)(6).  The hospital defendants have also moved under Rule 12(b)(7) seeking dismissal on the alternative ground that plaintiffs have failed to join Paul, whom they claim is a necessary party to these actions.

The motions have been fully briefed and oral argument was heard on December 14, 2016 in Utica, New York.  Decision was reserved.

## II. <u>BACKGROUND</u>[2]

On January 6, 2015, a U.S. postal employee reported to the Utica Police Department that "two males" were "fighting on the porch" at 1908 Whitesboro Street, the address where Paul lived with Michael, Michele, and Cindy. Compl. ¶¶ 27-28, 31-32. The police arrived at the family's apartment at about 1:15 p.m. <u>Id</u>. ¶¶ 28, 31.

According to Officer Penree's later report, Michael explained to the responding officers that Paul had attacked him and dragged him outside onto the porch during a shouting match. <u>See</u> Compl. ¶ 31. Michael further explained that Paul had also attacked, and possibly killed, the family dog by "stomp[ing] on" or "smashing" its head against the floor or wall. <u>Id</u>. ¶ 34. During this interview, Paul attacked Michael again and the officers were forced to separate the two of them. <u>Id</u>. ¶ 31.

In response to Officer Penree's questioning, Paul stated that "Michael had killed his dog and that he was [the] devil." Compl. ¶ 31. Officer Penree's report characterized Paul's behavior and statements—for instance, he "could not remember his name" and repeatedly claimed that he was someone other than himself—as "abnormal." <u>Id</u>. Officer Penree further reported that Paul's aunt Michele had stated to police that her adopted son's behavior was "unusual." <u>Id</u>.

Officer Anken made similar observations in his own report, which stated that Paul "was acting in a strange and bizarre manner," "talking to himself," "staring at the walls," that

---

[2] Because the pleadings filed in these consolidated cases are largely indistinguishable from each other and the parties have treated them as functionally identical, the following allegations are taken from the complaint filed in the lead case, 6:16-CV-439, and are assumed true for purposes of resolving the pending motions to dismiss. <u>Faiaz v. Colgate Univ.</u>, 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.) ("When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor.").

he "looked sickly," and that he was "unable to converse" with the police officers who were attempting to question him. Compl. ¶ 32. According to Officer Anken, family members also reported that Paul suffered from "a mental health condition" and it was "not known if he had been taking his medication." Id.

Based on interviews with the family as well as their own observations, the police concluded that Paul's possible mental health condition and his bizarre, aggressive behavior warranted an emergency mental health assessment.[3] Compl. ¶¶ 31-32. Police handcuffed Paul and placed him in the rear of Officer Penree and Anken's patrol car until EMS technicians could arrive to transport him to Faxton St. Luke's emergency department for an evaluation. Id. ¶¶ 32, 41. During the wait, Paul "was kicking the windows of the rear compartment" of the patrol car. Id. ¶ 32.

At approximately 1:43 p.m., EMS technicians arrived at the scene, prepared to transport Paul to the ER, communicated ahead to the hospital that Paul was "homicidal" and "uncooperative," and communicated to hospital staff that a mental health assessment appeared to be necessary. See Compl. ¶¶ 35-37. EMS records from the trip to the ER indicate that Paul "seem[ed] delusional," had admitted to taking heroine and drinking alcohol, was combative, and declared himself "the God of war." Id. ¶ 41.

At approximately 1:55 p.m., Tech Irizarry and Tech Devins, accompanied by the police, delivered Paul to the hospital's ER. Compl. ¶¶ 44-45. Officer Anken's report noted

---

[3] Article 9 of New York's Mental Health Law ("MHL") governs involuntary civil commitments in New York State. Rodriguez v. City of New York, 72 F.3d 1051, 1062 (2d Cir. 1995). As relevant here, § 9.41 empowers the police to temporarily detain a person who "appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others." Relatedly, § 9.39 permits a physician to involuntarily commit a mentally ill person on an emergency basis upon a finding that his condition "is likely to result in serious harm" to himself or others.

that the emergency department was "extremely busy" at this time, "perhaps as busy as [he had] ever seen." Id. ¶ 32. Because he continued to be "non-compliant," Officer Bajrektarevic assisted the EMS technicians and Security Guard Roe in placing Paul in "four-point" leather restraints. Id. ¶¶ 32-33, 62. Paul continued to be "incoherent, threatening, hearing voices, and homicidal." Id. ¶ 33.

Rather than formally charge Paul with any criminal activity at that time, Officer Bajrektarevic completed an Emergency 9.41 form, a document used by law enforcement to request an evaluation under Article 9 of the MHL. Compl. ¶ 48. The 9.41 form explained that Paul had been engaged in "strange[,] bizarre" behavior, had abused an animal, seemed "confused" and "disoriented," and that police and EMS had restrained him because there was a potential for violence. Id. The form also included a laundry list of Paul's aberrant behaviors. See id. ¶¶ 49-51. Although the police left the ER at approximately 2:10 p.m., Officer Bajrektarevic provided his contact information and advised the medical staff that police "should be notified prior to release" if the attending physician "does not require or order in-patient psychiatric medical services" for Paul. Id. ¶¶ 53-54.

At approximately 2:16 p.m., emergency room physician Dr. Amernath issued a continuing "restraint order" for Paul based on his determination that Paul might pose a danger to himself or to others. Compl. ¶ 68. During this time period, RN Congdon observed that Paul would not respond to his name and appeared to be "staring into space." Id. ¶ 56. At other times, RN Congdon observed Paul "yelling out attempting to fight." Id. ¶ 57. According to the complaint, RN Congdon initiated protocols for "psychiatric admission and evaluation." Id. ¶ 60. For some reason, these protocols were allegedly never carried to completion. Id. ¶ 61.

At 2:25 p.m., Dr. Amernath examined Paul.  Compl. ¶¶ 63-65.  Because Paul's clinical history indicated an "altered mental status" as well as "confusion" and "combative[ness]," Dr. Amernath ordered a CT scan of Paul's head as well as laboratory tests and a drug screen.  Id.  Although these diagnostic tests revealed the presence of marijuana in Paul's system, they were negative as to a broad range of other possible drugs.  Id. ¶¶ 66-67.

At approximately 3:07 p.m., RN Congdon documented that Paul remained "cognitively impaired, combative[,] and aggressive."  Compl. ¶ 71.  Dr. Amernath ordered continued restraints.  Id. ¶ 69.  For the next few hours, RN Blanchard and other nurses continued to document that Paul remained "cognitively impaired" and exhibited "agitated," "aggressive," "unsafe," and "psychotic" behavior.  Id. ¶¶ 71-73.

At approximately 5:07 p.m., Dr. Amernath is alleged to have mistakenly ordered Paul's discharge from the hospital.  Compl. ¶¶ 83-84, 86.  According to the complaint, hospital staff followed this order and began planning Paul's release despite the fact that no appropriate mental health assessment or examination ever occurred.  Id. ¶¶ 85-87, 89.

Shortly before his release, ER staff continued to observe Paul acting erratically.  For instance, at 6:20 p.m., RN Blanchard documented that Paul exhibited "psychotic behavior" and that attempts to prevent or curtail this unsafe behavior had failed.  Compl. ¶ 73.  At or around this same time, CSW Brown also documented that Paul appeared to be "paranoid."  Id. ¶ 75.

The complaint further alleges that Assistant Spoor observed Paul having a "very angry" conversation with a female visitor (who later turned out to be Michele, who had come to take him home).  See Compl. ¶ 78.  According to the complaint, Assistant Spoor overheard Paul tell Michele that "the demons had told him to go after the dog in order to

protect someone." Id.  Assistant Spoor failed to record these observations in the medical

record or report them to any other hospital staff members.  Id. ¶ 79.

At approximately 7:46 p.m., the hospital discharged Paul with a diagnosis of anxiety

and panic attacks.  Compl. ¶¶ 88, 93-95.  The discharge paperwork advised Paul to seek

care at a local outpatient clinic if he didn't feel better in two or three days'

time.  See id.  Although various hospital staff members knew about Officer Bajrektarevic's

written instructions, no one notified the police about Paul's discharge.  Id. ¶¶ 90, 92.

Following his discharge, Paul returned to the family home and, a few hours later,

murdered Michael, Michele, and Cindy.  Compl. ¶ 96.  Police were called back to Paul's

neighborhood just after midnight to investigate reports of a man behaving

strangely.  See id. ¶¶ 97-98.  They again detained Paul before discovering the mutilated

corpses of his family members a short time later.  Id.  Paul has since pleaded not guilty to

these crimes by reason of mental defect or disorder.  Id. ¶ 100.

## III.  LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be

enough to raise a right to relief above the speculative level.'"  Ginsburg v. City of Ithaca, 839

F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007)).  Although a complaint need only contain 'a short and plain statement of the claim

showing that the pleader is entitled to relief,' FED. R. CIV. P. 8(a)(2), more than mere

conclusions are required.  "Indeed, '[w]hile legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations.'"  Id. (quoting Ashcroft v. Iqbal, 556

U.S. 662, 679 (2009)).  "Dismissal is appropriate only where plaintiff has failed to provide

some basis for the allegations that support the elements of his claims."  Id.; see also

Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face").

## IV.  DISCUSSION

A review of the extensive briefing submitted by the parties necessitates a brief discussion about a few threshold issues.  First, some of the parties have submitted evidence in support of arguments better suited to a round of motion practice following the completion of discovery rather than at this juncture, before any has even occurred.

It therefore bears repeating that where, as here, a defendant seeks pre-answer dismissal of a complaint, "the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 113 (2d Cir. 2010) (quoting Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998)); see also Twombly, 550 U.S. at 556 (opining that this standard "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]"); Lunardini v. Mass. Mut. Life Ins. Co., 696 F. Supp. 2d 149, 163 (D. Conn. 2010) (Haight, J.) (observing that "the high bar of proof that applies at trial or on a motion for summary judgment is not relevant when adjudicating a motion to dismiss").

Relatedly, "[b]ecause a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials."  Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016).  Generally speaking, this universe of materials is confined to "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken."  Id. (quoting

Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

With the limitations of this threshold procedural mechanism in mind, the apparent invitation by some of the parties to consider extrinsic materials in deciding these motions must be declined. For instance, the attorney affidavit submitted in connection with Dr. Amernath's dismissal motion attempts to reference certain portions of what appear to be medical records generated during Paul's stay in the hospital's ER. See Payne Aff. ¶¶ 17, 19-26 (citing "Exhibit 12" as "Paul Bumbolo's chart from Faxton-St. Luke's Healthcare").[4]

To be sure, in some cases "a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." Goel, 820 F.3d at 559. Importantly, though, a document is only "integral" to the complaint "where it relies heavily upon its terms and effect." Id. (citation omitted). Accordingly, "[m]erely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough." Id.

Application of this limited exception is therefore appropriate only where the unincorporated material is a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 231 (2d Cir. 2016) (citation omitted). Even where these requirements are satisfied, though, consideration of the extrinsic material is only proper if it is clear on the existing record that

---

[4] Notably, Exhibit 12 is actually a copy of the prior consolidation order in this case.

(1) no dispute exists regarding the authenticity or accuracy of the document and (2) there are no material disputed issues of fact regarding the material's relevance.  Id.

This is not the case.  Although a number of plaintiffs' factual allegations ostensibly reference portions of medical notes that superficially appear to match those submitted by Dr. Amernath, plaintiffs also challenge the accuracy, or at the very least the completeness, of the medical records available at this time.  See, e.g., Pls.' Opp'n to Dr. Amernath's motion (asserting that a certain entry by CSW Brown was only completed "after the murders occurred and [were] publicized").  Accordingly, out of an abundance of caution, the extraneous materials submitted by the parties, including plaintiffs' expert affirmations, will not be considered at this early stage of the case.  See, e.g., Beswick v. Sun Pharm. Indus., Ltd., 2011 WL 1585740, at *3 (W.D.N.Y. Mar. 4, 2011) (declining to consider medical records on motion to dismiss because, inter alia, "the Court has no idea how many material issues of fact may lie" among them); Bartley v. Artuz, 1999 WL 942425, at *4 (S.D.N.Y. Oct. 19, 1999) (concluding same where "entries contain[ed] illegible notations in several different handwritings").

Finally, some of the moving defendants have opened their briefing by asserting that plaintiffs' pleadings fail to pass muster under Rule 8.  Among other things, Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and directs that "[e]ach allegation must be simple, concise, and direct."  FED. R. CIV. P. 8.  Essentially, Rule 8's mandate ensures that a pleading provides sufficient notice of the factual basis for the claims asserted so as to permit a defendant to frame an intelligent defense.  See, e.g., Ritchie v. N. Leasing Sys., Inc., 14 F. Supp. 3d 229, 235-37 (S.D.N.Y. 2014).

The pleadings in this consolidated action may be both voluminous and repetitive, but a review of the documents themselves confirms that plaintiffs have offered numerous, specific factual allegations against specific defendants.  In fact, the substance of the motions to dismiss filed in this action establishes that the various moving defendants have had no trouble identifying the nature of plaintiffs' claims against them and competently framing arguments in support of dismissal.  Accordingly, those arguments will be rejected.

With these threshold matters settled, what remains are the merits of the pending motions.

## A.  Municipal Defendants

Plaintiffs assert § 1983 claims against the municipal defendants for the denial of substantive due process as well as state law claims for negligence.  The police defendants and the EMS defendants have filed separate motions to dismiss.

### 1.  Section 1983 & Substantive Due Process

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992).  However, "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).  Accordingly, a § 1983 claim requires a plaintiff to show (1) the deprivation of a right, privilege, or immunity secured by the Constitution and its laws by (2) a person acting under the color of state law.  See 42 U.S.C. § 1983.

The § 1983 claims in this case are based on alleged violations of decedents' substantive due process rights to bodily integrity and/or personal security.  According to

- 15 -

plaintiffs, the municipal defendants created or increased the danger to decedents by communicating to Paul "that he could do as he wanted without any repercussions."

As a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). Nevertheless, the Second Circuit has "recognized two exceptions to this general principle." Matican v. City of N.Y., 524 F.3d 151, 155 (2d Cir. 2008).

First, "the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a 'special relationship' with the victim." Matican, 524 F.3d at 155. "Special relationships ordinarily arise if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment." Lombardi v. Whitman, 485 F.3d 73, 79 n.3 (2d Cir. 2007); see also Campbell v. Brentwood Union Free Sch. Dist., 904 F. Supp. 2d 275, 280 (E.D.N.Y. 2012) (observing that this exception "does not include non-custodial relationships").

Second, "the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim." Matican, 524 F.3d at 155. In other words, "[w]here a government official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm), the government official can potentially be liable for damages." Lombardi, 485 F.3d at 80.

In addition to identifying one of these exceptions, a § 1983 substantive due process plaintiff must also show that the defendant's conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Campbell, 904 F. Supp. 2d at 280 (citation omitted).

As the Supreme Court has explained, intentionally inflicted injuries are the "most likely to rise to the conscience-shocking level." Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). Conversely, "negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id. Between these two extremes, "reckless inflicted harms are context-dependent 'closer calls.'" Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (citation omitted).

For instance, "harm inflicted recklessly or with deliberate indifference does not shock the conscience in the context of a time-sensitive emergency, such as a high-speed chase." Matican, 524 F.3d at 158. "However, even in the context of deliberative decision-making, the Second Circuit has recognized that where state actors have been subject 'to the pull of competing obligations,' the courts should be reluctant to impose 'broad constitutional liability for the government officials, whose decisionmaking might be inhibited by the threat of lawsuits." Chambers v. N. Rockland Cent. Sch. Dist., 815 F. Supp. 2d 753, 770 (S.D.N.Y. 2011) (quoting Matican, 524 F.3d at 159) (internal citation omitted).

### i. **Police Defendants**

The police defendants argue that plaintiffs' allegations do not support either of the two recognized exceptions to the DeShaney rule. According to the police, the "special relationship" exception does not apply in this case because decedents themselves were never taken into custody. The police further argue that the "state-created danger" exception does not apply because plaintiffs' allegations attribute only passive conduct to the various officers in the form of certain "failures" to act, none of which can plausibly be inferred to constitute implicit or explicit encouragement of Paul's acts of private violence. Plaintiffs respond that the police defendants' initial decision to take Paul into custody, coupled with

their subsequent course of interaction with him, encouraged or emboldened Paul to return home and resume his attacks on his family members.

First, the police defendants are correct to assert that DeShaney's "special relationship" exception is inapplicable to the facts of this case. As the police point out, a "special relationship" of the sort contemplated by DeShaney can only be created where the state assumes custody or control of the plaintiff. See, e.g., Campbell, 904 F. Supp. 2d at 280 ("The touchstone of the 'special relationship' exception to the DeShaney rule is the requirement that the state has somehow placed the victim within its custody."); Bush v. City of Utica, 948 F. Supp. 2d 246, 256 (N.D.N.Y. 2013) (finding plaintiffs' reliance on the "special relationship" exception misplaced where "decedents were not in the custody of the state in any manner" during the relevant time period); Tufaro v. City of N.Y., 2014 WL 4290631, at *3 (S.D.N.Y. Aug. 28, 2014) ("Because Plaintiff was not in involuntary custody at the time of her attack, she fails to satisfy this exception to DeShaney.").

In this case, none of the decedents are alleged to have been taken into involuntary custody at any point in the police encounter; rather, the direct interactions between decedents and the police were the interviews taken at the family's home and the assurances that the officers would get help for Paul before the EMS defendants transported him to the hospital's ER. Insofar as plaintiffs attempt to borrow from state law negligence principles to argue that the police's exercise of authority under MHL § 9.41 gave rise to a special relationship of a federal constitutional dimension, that claim is rejected.

At this early stage, however, plaintiffs have sufficiently pleaded § 1983 state-created danger claims against the police defendants to survive dismissal. See Gothberg v. Town of Plainville, 148 F. Supp. 3d 168, 184 (D. Conn. 2015) (Haight, J.) (treating plaintiff's

state-created danger claim with skepticism but "intimat[ing] no view as to how the case at bar may progress through its later stages").

The police are correct to assert that a significant number of plaintiffs' factual allegations focus on things the police supposedly *failed* to do. See Pena v. DePrisco, 432 F.3d 98, 110 (2d Cir. 2005) ("A failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state *created* danger."). But it is equally clear from the pleadings that the police defendants are alleged to have taken a series of affirmative acts that, liberally construed, could plausibly give rise to § 1983 liability under these circumstances.

The crux of plaintiffs' § 1983 claims is that the course of action the police undertook—temporarily detaining Paul before deciding to simply hand him over to an incredibly busy local hospital rather than arresting him, detaining him, observing him, following up on his status, or otherwise continuing with any direct involvement in the matter themselves—communicated to Paul that the police had no further interest in interfering with his violent behavior or otherwise punishing him for his demonstrated desire to do harm to his family members. According to plaintiffs, these interactions under these circumstances implicitly encouraged or emboldened Paul to return home and resume his attacks, since he understood that the police had decided to wash their hands of the situation.

In other words, the pleadings in this case tug on the common thread running through a type of state-created danger theory recognized by our Circuit: they allege that either "explicitly or implicitly, the police communicated to the [actor] that his or her actions were acceptable or, at least, would go unpunished." Bunn v. City of Poughkeepsie, 2012 WL 1621563, at *5 (S.D.N.Y. May 9, 2012) (contemplating instances where "subsequent

inaction" by police might generate an "inference of official approval" in the actor's mind); cf. Pena, 432 F.3d at 111 (concluding that the question of whether "deliberate silence" that allegedly implicitly communicated "prior assurances of impunity" constituted a "factual determination which [cannot be] resolve[d] on a 12(b)(6) motion to dismiss").

These allegations also support a finding, at least for now, that the police defendants' affirmative creation or enhancement of the risk of violence to decedents constitutes conscience-shocking behavior.  After all, plaintiffs allege that the police chose this particular course of conduct after having had the opportunity to directly observe Paul's relentless, violent, and incredibly bizarre behavior toward his family members (having even been forced to break up a renewed physical attack on Paul's uncle), were aware that Paul had seriously injured the family's dog for seemingly nonsensical reasons, and were on notice that Paul suffered from an ongoing mental condition for which he had been prescribed some form of medication.  Cf. Okin, 577 F.3d at 432 ("To the extent that the police officers were *not* aware of the seriousness of domestic violence, this reflects a deficiency in the officers' training . . . .").  Accordingly, the police defendants' motion to dismiss on this basis is rejected.

Next, the police defendants claim that they are entitled to dismissal on the basis of qualified immunity because the factual allegations demonstrate that they acted reasonably under the circumstances; in the alternative, they argue that the law surrounding a MHL § 9.41 non-criminal custodial arrest is "unsettled at best" and therefore not "clearly established" for purposes of this analysis.  Plaintiffs respond that decedents' rights to be free from violence and a known risk of serious harm were clearly established at the time the incident occurred.

- 20 -

"The privilege of qualified immunity generally shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate established statutory or constitutional rights of which a reasonable person would have known.'" Gothberg, 148 F. Supp. 3d at 185 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

"In general, public officials are entitled to qualified immunity if (1) their conduct does not violate a clearly established right, or (2) it was objectively reasonable for them to believe that their acts did not violate those rights." Gothberg, 148 F. Supp. 3d at 185 (quoting Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)).

However, a defendant seeking to dismiss a complaint under Rule 12(b)(6) on the basis of the affirmative defense of qualified immunity "will generally face a difficult road." Garcia v. Does, 779 F.3d 84, 97 (2d Cir. 2014). This is so because a resolution of the qualified immunity question will often depend "on the determination of certain factual questions that cannot be answered at this stage of the litigation." Denton v. McKee, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004).

"But that does not mean that qualified immunity can never be established at the pleading stage. To the contrary, every case must be assessed on the specific facts alleged in the complaint." Garcia, 779 F.3d at 97. Indeed, "the Supreme Court has repeatedly 'stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" Gersbacher v. City of N.Y., 134 F. Supp. 3d 711, 721 (S.D.N.Y. 2015) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

As the preceding discussion makes clear, plaintiffs' factual allegations preclude a determination at this juncture that the police defendants' conduct was objectively reasonable

under these circumstances.  Further, decedents' rights under the Due Process Clause to be free of a state-created danger of serious physical harm was clearly established by the time the events in this lawsuit occurred.  See Gothberg, 148 F. Supp. 3d at 185; see also Pearce v. Labella, 473 F. App'x 16, 19 (2d Cir. 2012) (summary order) (concluding same where § 1983 state-created danger claim was based on Okin's "explicit or implicit encouragement" language).  Accordingly, the police defendants' motion to dismiss on this basis is rejected.

Finally, the police defendants argue the pleadings fail to state a Monell claim against the City because the allegations do not identify any particular deficiencies in UPD policy and procedure or describe how the police have handled other 9.41 incidents in the past.  Plaintiffs respond that they have plausibly alleged that the City failed to train its officers in how to deal with 9.41 incidents, evidenced by the fact that multiple officers chose to transport Paul to the hospital's ER and simply left him there without securing him, taking him into custody, or even making any attempt to follow up on his status.

As a general matter, Monell does not provide a separate cause of action against a municipal entity; rather, "it *extends* liability to a municipal organization where that organization's [policy, practice, or custom] led to an independent constitutional violation."  Segal v. City of N.Y., 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original).

However, "[b]efore a municipality can be held liable under § 1983, it must be shown to have been 'the moving force of the constitutional violation.'"  Carmichael v. City of N.Y., 34 F. Supp. 3d 252, 262-63 (E.D.N.Y. 2014) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)); see also Cash v. Cty. of Erie, 654 F.3d 324, 341-42 (2d Cir. 2011) (equating "moving force" and "proximate cause").

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove:  (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted).

"The fifth element reflects the notion that 'a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.'"  Cown, 95 F. Supp. 3d at 636 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997)).  Importantly, this element "can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort.'"  Roe, 542 F.3d at 36 (citation omitted).  However, a "municipal policy may be pronounced or tacit and reflected in either action or inaction."  Cash, 654 F.3d at 334.

Accordingly, a plaintiff may satisfy this fifth element with evidence of:  "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees."  Cown, 95 F. Supp. 3d at 637 (quoting Brandon v. City of N.Y., 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

With this framework in mind, plaintiffs have sufficiently pleaded a Monell claim to survive dismissal at this early stage because the allegations in the complaints "tend[ ] to support, at least circumstantially, an inference" that the City failed to train its officers in how

to respond appropriately to violent, mentally ill citizens like Paul who posed a demonstrable risk of harm to close family members and that this failure may have constituted deliberate indifference under these circumstances.  Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012); see also Walker v. City of N.Y., 974 F.2d 293, 297-98 (2d Cir. 1992) (setting forth three requirements necessary to ultimately prove a failure-to-train claim but noting that "the particular context might make the need for training or supervision so obvious that a failure to do so would constitute deliberate indifference").

The police defendants are alleged to have directly observed Paul's violent and bizarre behavior and reacted by taking Paul into temporary custody, dropping him off at the hospital, and discontinuing any further involvement.  No police officer was stationed at the hospital; nor did the police ever contact the hospital to follow up as to Paul's status or seek information regarding whether or not he was to be released.

The pleadings further indicate this was standard operating procedure for UPD personnel, an inference bolstered by the allegation that seven different officers apparently reached the same conclusion about the appropriate course of action in this case.  Prevost v. City of N.Y., 2014 WL 6907560, at *6 (S.D.N.Y. Dec. 9, 2014) (liberally construing Monell claim in plaintiff's favor on a motion to dismiss even though the pleading "could have done a better job making clear what it finds lacking in police officer training").

Finally, the fact that this alleged policy had not resulted in a tragic outcome in the past does not necessarily insulate it from constitutional scrutiny.  Cf. Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 392-93 (S.D.N.Y. 2013) (denying motion to dismiss Monell claim based on a single-incident theory where municipality allegedly failed to train its officers on how to deal with "emotionally disturbed persons" and noting that "[d]iscovery will shed

light on whether [municipal] policymakers were, in fact, deliberately indifferent").  Accordingly, the police defendants' motion to dismiss the <u>Monell</u> claim is rejected.

### ii. <u>EMS Defendants</u>

With the contours of the § 1983 substantive due process law set forth above firmly in mind, a different conclusion must be reached with respect to the EMS defendants.  As these defendants correctly argue, Tech Irizarry and Tech Devins are alleged to have done no more than transport Paul to the ER at the explicit direction of the police, who had assumed continuing control over the situation.  The pleadings do not plausibly suggest that these defendants affirmatively communicated to Paul, explicitly or implicitly, that his behavior would go unpunished.  Accordingly, the § 1983 claims against these defendants will be dismissed.

### 2. <u>Negligence</u>

In New York, "[a]n action to recover for negligence does not lie unless there exists a duty on the part of the defendant and a corresponding right in the plaintiff."  <u>Saint-Guillen v. United States</u>, 657 F. Supp. 2d 376, 383 (E.D.N.Y. 2009).  "The question of whether a member or group of society owes a duty of care to reasonably avoid injury to another is of course a question of law for the courts."  <u>Id.</u> (citation omitted).

"When a negligence claim is asserted against a municipality, the first issue for a court to decide is whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose."  <u>Applewhite v. Accuhealth, Inc.</u>, 21 N.Y.3d 420, 425 (N.Y. 2013).  "If the municipality's actions fall in the proprietary realm, it is subject to suit under the ordinary rules of negligence applicable to nongovernmental parties."  <u>Id.</u> (citation omitted).  "A government entity performs a purely proprietary role when its activities essentially substitute for or supplement traditionally private

enterprises." Id. (citation and internal quotation marks omitted).

"In contrast, a municipality will be deemed to have been engaged in a governmental function when its acts are undertaken for the protection and safety of the public pursuant to the general police powers." Applewhite, 21 N.Y.3d at 425. (citation and internal quotation marks omitted).  In other words, "the government will be subject to ordinary tort liability if it negligently provides services that traditionally have been supplied by the private sector." Id. at 426.

In government function cases, there are "two separate but well-established grounds for a municipality to secure dismissal of a tort claim brought against it by a private citizen injured by a third party." Valdez, 18 N.Y.3d at 75.  First, under the public duty rule, a municipality's general duty to the public at large "does not create a duty of care running to a specific individual sufficient to support a negligence claim[ ] unless the facts demonstrate that a special duty was created." Bower v. City of Lockport, 982 N.Y.S.2d 621, 623 (N.Y. App. Div. 4th Dep't 2014).  As the New York Court of Appeals has explained, "[w]e have deemed it necessary to restrict the scope of duty in this manner because the government is not an insurer against harm suffered by its citizenry at the hands of third parties." Valdez, 18 N.Y.3d at 75.

Second, even where a special duty is alleged to exist between the plaintiff and the municipal defendant, "the common-law doctrine of governmental immunity" will nevertheless shield the public entity "from liability for discretionary actions taken during the performance of governmental functions." Valdez, 18 N.Y.3d at 75-76 (citations omitted).  "In other words, even if a plaintiff establishes all elements of a negligence claim, a state or municipal defendant engaging in a governmental function can avoid liability if it timely raises the

defense and proves that the alleged negligent act or omission involved the exercise of discretionary authority." Id. at 76.

Importantly, though, this discretion-based immunity will only attach where the municipal defendant "establishes that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated"; that is, the municipal defendant must establish that "the action taken actually resulted from discretionary decision-making." Valdez, 18 N.Y.3d at 76, 79-80; see also Pearce, 971 F. Supp. 2d at 272 (denying summary judgment to municipal defendants because a reasonable jury could find police's failure to investigate domestic incident violated mandatory departmental policy rather than resulted from discretionary allocation of police services).

"[A] special duty can arise in three situations:  (1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition." Applewhite, 21 N.Y.3d at 426.

The first prong of the special duty rule requires that the statute at issue authorize a private right of action, which may be fairly implied when (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) recognizing such a right would promote the legislature's purpose; and (3) to do so would be consistent with the legislative scheme. McLean v. City of N.Y., 12 N.Y.3d 194, 200 (N.Y. 2009).

The second prong of the special duty rule requires satisfaction of a four-factor test:  (1) an assumption by a municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of a municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's

agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.  Pearce, 971 F. Supp. 2d at 270.

The third prong of the special duty rule typically arises in the health and safety context and "has been recognized only in rare circumstances, [such] as when a municipality, having actual knowledge of a blatant violation of safety laws, nevertheless provides affirmative assurances of safety on which the injured plaintiff relies."  Abraham v. City of N.Y., 828 N.Y.S.2d 502, 508 (N.Y. App. Div. 2d Dep't 2007).[5]

### i.  Police Defendants

With these principles in mind, plaintiffs have pleaded plausible claims for negligence against the police defendants.  As the New York Court of Appeals observed in Cuffy v. City of New York, "at the heart of most of these 'special duty' cases is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection."  69 N.Y.2d 255, 261 (N.Y. 1987).  Accordingly, "whether there is a special duty, and the entailed inquiry as to whether there has been justifiable reliance, are generally factually laced and, as such, ordinarily unsuitable for disposition purely as matters of law."  Valdez, 18 N.Y.3d at 88 n.2 (Jones, J., dissenting).

In this case, plaintiffs allege the police defendants came into direct contact with

---

[5]  For instance, it has been successfully invoked where a municipality's plumbing inspector "directed the plaintiff to perform a clearly unsafe air pressure test," Delanoy v. City of White Plains, 995 N.Y.S.2d 725, 726 (N.Y. App. Div. 2d Dep't 2014), and unsuccessfully asserted where a municipality's building inspector "inspected [an allegedly defective] wall, and, finding that the wall did not pose a hazard, took no action," even though the wall later struck and injured the plaintiff.  McCarthy v. City of N.Y., 988 N.Y.S.2d 667, 669 (N.Y. App. Div. 2d Dep't 2014).

decedents at the time they responded to the report of a domestic incident at the Bumbolo

family home, interviewed the family members, and initially chose to detain Paul.  Plaintiffs

further allege that, in response to requests from family members that Paul receive help for

his existing mental condition and violent, bizarre behavior, the police explained they were

taking him to the hospital for a mental evaluation.  Cf. Philip v. Moran, 7 N.Y.S.3d 294, 296

(N.Y. App. Div. 2d Dep't 2015) (concluding no special relationship could exist where

responding officers "made no promises to the plaintiff, in word or action" during an

after-the-fact investigation of "a completed crime").

Notably, the police are further alleged to have learned of Paul's violent, relentless

attacks on the family members with whom he lived not only from the family's reports but also

from direct observation, since Paul resumed his attack on Michael while police were present

in the home.  In other words, the police's own observations put them on notice that an

inappropriate or inadequate response would almost certainly lead to renewed harm to Paul's

family members.  Coleson v. City of N.Y., 999 N.Y.S.2d 810, 812-14 (N.Y. 2014) (finding

triable issues of fact existed on justifiable reliance claim where plaintiff's abusive husband

located and stabbed her two days after police arrested him and allegedly promised plaintiff

she would be safe because he would be in jail "for a while").[6]

With these allegations in mind, plaintiffs have plausibly alleged that decedents

justifiably relied on the police defendants' promise to put a stop to Paul's aberrant behavior.

And taking the factual allegations of the pleadings as true, it is impossible to determine at this

juncture that (a) the City actually vested its police with discretionary authority in dealing with a

---

[6]  Although the husband in Coleson was subject to an existing order of protection, the Court of
Appeals focused on the police's alleged "substantial, involved, and interactive" contact with the plaintiff herself
in evaluating the elements of justifiable reliance.

private citizen who met the criteria under MHL § 9.41 and (b) the police's course of conduct in this particular case resulted strictly from discretionary decision-making flowing from that authority. Cf. Trimble v. City of Albany, –N.Y.S.3d–, 2016 WL 6883669, at * (N.Y. App. Div. 3d Dep't Nov. 23, 2016) (reviving special-relationship-based negligence claim against municipal defendants who negligently extinguished house fire where record failed to clearly demonstrate that the alleged negligence resulted from "an actual decision or choice").

Finally, although the police maintain that their responsibilities ended the moment they handed Paul off to the ER that evening, plaintiffs have plausibly alleged that, under these circumstances, the officers were negligent in failing to maintain a presence at the hospital, or in failing to follow up with the hospital regarding whether Paul would be released, or, in the event of his release, in failing to consider whether he should be arrested for his earlier crimes.  In sum, it is far from clear at this point that the officers' conduct in this case resulted from "strictly discretionary decision-making." Pearce, 971 F. Supp. 2d at 272.  Accordingly, the police defendants' motion to dismiss on this basis is rejected.

### ii.  **EMS Defendants**

The EMS defendants also argue they owed no special duty to the decedents because Tech Irizarry and Tech Devins merely transported Paul to the ER and turned him over to the hospital's medical staff at the explicit direction of the police.  Plaintiffs respond that they are not required to plead a special duty against these defendants.

First, the EMS defendants are correct to assert that any negligence claim against them under these circumstances requires the existence of a special duty.  See Applewhite, 21 N.Y.3d at 428 ("[P]ublicly-employed, front-line EMTs and other first responders, who routinely place their own safety and lives in peril in order to rescue others, surely fulfill a

government function . . . .").  Second, and unlike the police defendants, the pleadings do not

clearly allege any contact between these defendants and the decedents themselves, since

their brief involvement in events took place at the explicit command of the police, who had

already detained Paul in the back of one of the police cruisers.  Third, even accepting

plaintiffs' claim that decedents belonged to the class of "others" that MHL § 9.41 seeks to

protect from the "substantial risk of harm" posed by a mentally ill individual, a finding that

MHL Article 9 implies a private right of action giving rise to liability appears to be wholly

inconsistent with the intent of the legislative scheme.  See McLean, 878 N.Y.S.2d at 242;

cf. N.Y. Mental Hygiene Law § 9.59 (shielding first responders from liability for conduct during

act of transportation absent gross negligence).  Accordingly, the negligence claims against

the EMS defendants will be dismissed.

### B.  Medical Defendants

Plaintiffs assert state law claims against all of the medical defendants for

"negligence/medical malpractice," wrongful death, and conscious pain and suffering.

Dr. Amernath and the hospital defendants have filed separate motions that press two,

relatively straightforward arguments in favor of outright dismissal:  (1) these defendants did

not owe *any* duty of care to the decedents; and (2) Paul's extraordinary misconduct

constitutes an intervening intentional act that severs any chain of causation as a matter of

law.  In the alternative, the hospital defendants have also moved for dismissal under Rule

12(b)(7).

### 1.  Duty of Care

"To prove a prima facie case of negligence, a plaintiff must demonstrate the existence

of a duty, a breach of that duty, and that the breach of such duty was a proximate cause of

his or her injuries." Fox v. Marshall, 928 N.Y.S.2d 317, 320 (N.Y. App. Div. 2d Dep't 2011). "In order to establish a claim for medical malpractice in New York, a plaintiff must prove (1) a deviation or departure from accepted community standards of practice, and (2) that such departure was a proximate cause of the plaintiff's injuries." Quinn v. United States, 946 F. Supp. 2d 267, 277 (N.D.N.Y. 2013) (Suddaby, J.).

However, "in order to reach any discussion about deviation from accepted medical practice, it is necessary first to establish the existence of a duty." Burtman v. Brown, 945 N.Y.S.2d 673, 677 (N.Y. 2012). Likewise, "[a] duty of reasonable care owed by a tortfeasor to a plaintiff is elemental to any recovery in negligence." Fox, 928 N.Y.S.2d at 320.

"The question of whether a member or group of society owes a duty of care to reasonably avoid injury to another is [one] of law for the courts." Davis v. S. Nassau Cmtys. Hosp., 26 N.Y.3d 563, 572 (N.Y. 2015) (citation omitted). "Courts resolve legal duty questions by resort to common concepts of morality, logic and consideration of the social consequences of imposing the duty." Id. (quoting Tenuto v. Lederle Labs., Div. of Am. Cyanamid Co., 90 N.Y.2d 606, 612 (N.Y. 1997)). "A critical consideration in determining whether a duty exists is whether the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." Id. (citation and internal quotation marks omitted).

### i. Dr. Amernath

Dr. Amernath argues that none of the claims against him are even legally cognizable because he owed no duty to plaintiffs' non-patient decedents. Plaintiffs respond that physicians and other health care providers owe a duty of care to identifiable third parties who

suffer harm in circumstances such as these.[7]

Of course, "[a] physician's duty of care is ordinarily one owed [only] to his or her patient." Purdy v. Pub. Adm'r of Cty. of Westchester, 72 N.Y.2d 1, 9 (N.Y. 1988). And as counsel repeatedly emphasized at oral argument, a review of the applicable case law in New York leaves little doubt that the courts "have been reluctant to expand a doctor's duty of care to encompass nonpatients." McNulty v. City of N.Y., 100 N.Y.2d 227, 232 (N.Y. 2003).

Indeed, the New York Court of Appeals has expressly "declined to impose a broad duty of care extending from physicians past their patients 'to members of the . . . community individually.'" Davis, 26 N.Y.3d at 572 (quoting Eiseman v. State of N.Y., 70 N.Y.2d 175, 187 (N.Y. 1987)); see also McNulty, 100 N.Y.2d at 232 (recognizing "the danger that a recognition of [such] a duty would render doctors liable to a prohibitive number of possible plaintiffs").

But that is not the whole story. New York courts have also recognized that, "under certain circumstances, the law is flexible enough to imply a duty of care by a doctor, [even] in a medical malpractice context, *to those who are not patients*." Fox, 928 N.Y.S.2d at 322 (emphasis added); see also Rivera v. N.Y. City Health & Hosps. Corp., 191 F. Supp. 2d 412, 418 (S.D.N.Y. 2002) (Chin, D.J.) (surveying New York law before concluding that "medical doctors owe a duty of care to their patients and persons they knew or reasonably should have known were relying on them for services to the patient, but they do not owe a duty to

---

[7] In pressing this argument, Dr. Amernath leans heavily on the medical records he submitted in connection with his motion. For instance, he asserts that Paul's mental status had normalized during the time period immediately before his discharge. He also asserts that CSW Brown performed some manner of evaluation on Paul prior to his release. In response, plaintiffs have submitted expert affidavits from two mental health professionals and have called into question the accuracy of CSW Brown's treatment notes. For the reasons discussed in some detail at the outset, these materials will not be considered at this stage of the case.

the public at large").

For instance, as the Court of Appeals recognized recently in Davis, New York law recognizes that "members of a patient's immediate family or household who may suffer harm as a result of the medical care a physician renders to that patient benefit from a duty of care running to them from the physician." 26 N.Y.3d at 574 (citing Tenuto, 90 N.Y.2d at 610-14).[8]

In fact, there is a fair argument to be made that Davis approved an even more expansive formulation of a physician's duty of care. There, the defendant-physician performed an outpatient procedure using a certain drug, but failed to warn the patient that this medication might impair her ability to safely drive an automobile. Davis, 26 N.Y.3d at 569. After the procedure, the patient drove herself home, where she crossed a double yellow line and struck a bus driven by the plaintiff. Id. Ultimately, the Court concluded that under those circumstances the medical provider owed a duty to third parties to warn the patient of the danger of the medication's potentially dangerous side effects. Id. at 570.

Associate Judge Leslie E. Stein dissented from this result, explaining that this holding actually expanded the duty of a physician beyond a specific, identifiable group of third parties to all members of the public at large who may come into contact with a patient at some point following treatment. Davis, 26 N.Y.3d at 587-88 (Stein, J., dissenting). As she explained, in her view the case law on this subject draws a narrower boundary:

> The rule of law that emerges from this line of cases is easily discerned. In New York, a physician's duty to a patient, and the corresponding liability, may be extended beyond the patient only to someone who is both a readily identifiable third party of a definable class, usually a family member, *and* a person who the physician

---

[8]  The Davis Court characterized its later decision in McNulty as "arguably constrain[ing]" its earlier holdings by limiting this duty to harm arising from the physician's treatment of the patient. 26 N.Y.3d at 574-75.

> knew or should have known could be injured by the physician's affirmative creation of a risk of harm through his or her treatment of the patient.

<u>Davis</u>, 26 N.Y. 3d at 587 (Stein, J., dissenting).

Plaintiffs' allegations in this case easily satisfy even Judge Stein's narrower formulation of the rule. Here, plaintiffs allege that Dr. Amernath and the other members of the medical staff at the hospital were aware of the circumstances under which the police removed Paul from his family's home and delivered him to the ER, were able to personally observe his continued violent, bizarre, and erratic behavior, and received information over the course of several hours that his mental health had not substantially improved. Plaintiffs further allege that despite this information, Dr. Amernath did not perform or request a mental health evaluation or even consult with a qualified psychiatric practitioner prior to ordering Paul's discharge to the care of those same family members.

At oral argument, Dr. Amernath cited both <u>Tenuto</u> and <u>Davis</u> to attempt to narrow the outer boundaries of possible physician liability even further, insisting that this line of cases stand for the proposition that a doctor is only liable to a class of third parties like the decedents where he has administered some drug with possible side effects. After all, <u>Tenuto</u> was based on a physician's alleged failure to advise the parents of their own risk of exposure to an oral polio vaccine that had been administered to the couple's five-month-old child. 90 NY2d 606. And as just discussed, <u>Davis</u> involved a physician's failure to warn of the side effects of a drug that impaired the patient's ability to drive. 26 N.Y.3d at 569.

But that is a false equivalency, since the breadth of a physician's treatment relationship with the patient is not limited to the simple administration of a drug or vaccine. As Judge Stein explained in her dissent, it is the risk of harm to identifiable third

parties who the physician knows or should know is relying on the physician's treatment decisions that informs the duty in these cases. Davis, 26 N.Y. 3d at 587 (Stein, J., dissenting); see also McNulty, 100 N.Y.2d at 233 (noting the duty at issue arises from the doctor's performance of a "medical service to the patient" that results "in the harm complained of by the third persons").

Equally important to this analysis, decedents in this case were Paul's family members who shared his household. They were therefore members of "an identifiable and readily limited class," not the "indeterminate, faceless, and ultimately prohibitively large class of plaintiffs" posited in defendant's briefing. Davis, 26 N.Y.3d at 573; see also id. at 584 (dissenting on duty question because plaintiff "was an unidentified and unknown stranger to defendants' physician-patient relationship").

This same limiting principle has been recognized by other New York courts. For instance, in Fox v. Marshall, the mentally ill defendant obtained a temporary pass to leave a residential treatment facility and returned home, where he brutally murdered his neighbor. 928 N.Y.S.2d at 319. The appellate division found the mental health provider owed no duty to the decedent because, among other things, she did not fall into the "narrow class of potential plaintiffs," such as the patient's "immediate family members," to which a physician's duty of care had been extended. Id. at 323; McNulty, 762 N.Y.S.2d at 235 (Kaye, C.J., concurring) (explaining view that this duty should not be extended to a "patients' friends, acquaintances and unknown other potential plaintiffs").

Finally, this case is not about a mere error in medical judgment. Rather, plaintiffs allege that Dr. Amernath's decisions amounted to "something less than a professional medical determination." Cerbelli v. City of N.Y., 600 F. Supp. 2d 405, 414 (E.D.N.Y.

2009); see also Rodriguez v. City of N.Y., 72 F.3d 1051, 1063 (2d Cir. 1995) ("Implicit in § 9.39's requirement that the decision be made by a physician is the premise that the decision will be made in accordance with the standards of the medical profession."); cf. Rivera, 191 F. Supp. 2d at 424 ("The complaints here allege not just that the mental health care providers erred in the exercise of their professional judgment, but they allege that the medical defendants failed to conduct careful examinations and make considered decisions as reasonably competent mental health practitioners.").

Under the particular circumstances presented here, plaintiffs have plausibly alleged that Dr. Amernath knew, or should have known, that decedents were relying on him and other medical providers at the ER to exercise proper medical judgment in treating Paul's violent mental condition and that, as a result of the alleged failure to do so and subsequent mistaken release, decedents suffered death.

Plaintiffs have also plausibly alleged Dr. Amernath had a duty to control Paul.  "In general, a defendant has no duty to control the conduct of a person to prevent him from causing harm to others." Rivera, 191 F. Supp. 2d at 417.  However, "[t]he New York State Court of Appeals has recognized that, under certain circumstances, a defendant has a duty to the general public to control the conduct of another to prevent that person from harming others." Saint-Guillen, 657 F. Supp. 2d at 383-84; Avins v. Fed'n Emp't & Guidance Serv., Inc., 857 N.Y.S.2d 550 (N.Y. App. Div. 1st Dep't 2008) (recognizing "there are special circumstances in which New York imposes a duty to control the conduct of others").

 For example, "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person from doing such harm." Saint-Guillen, 657 F.

Supp. 2d at 384 (quoting Restatement (Second) of Torts at § 319)).

"With regard to a claim under § 319 alleging a failure to control a third party with known dangerous propensities, the two requirements for triggering this duty are:  (1) sufficient knowledge of the danger posed by the third person; and (2) sufficient ability to control the relevant conduct of the third person." Ben v. United States, 160 F. Supp. 3d 460, 478 (N.D.N.Y. 2016) (citation and internal quotation marks omitted) (applying New York law to federal tort claim against U.S. Probation Office where probationer harmed member of the general public).

In this case, plaintiffs allege that Dr. Amernath knew or should have known of the continuing dangerousness posed by Paul's deteriorated mental state through the reports of other medical staff, from his obligation to take or order a proper patient history, or even from his obligation to conduct or to order an appropriate mental health evaluation.

Notably, this was far from a voluntary outpatient setting—the circumstances under which Dr. Amernath and the other medical staff at the hospital's ER took charge of Paul gave rise to the ability to control whether he was released into the general public, held for observation for some period of time, involuntarily committed, or returned to the Utica police.  Compare Purdy, 72 N.Y.2d at 9 (finding no duty to members of the general public where defendant health facility lacked authority, in non-emergency context, to restrict voluntary resident of nursing home from leaving), with Rivera, 191 F. Supp. 2d at 422-23 (observing that the MHL gives mental health providers "mechanisms by which to seek to control patients, including outpatients, who are a threat to themselves or others"), and Saint-Guillen, 657 F. Supp. 2d at 385 ("As a mental health provider who knows of his outpatient's dangerous propensities, defendant had [a] duty to control [the patient] because it

had the requisite knowledge of his dangerousness and the ability to control his actions.").

Plaintiffs have also pleaded a claim for negligence against Dr. Amernath based on his failure to inform the police that Paul would be released that evening.  Among other things, the pleadings allege that the police informed the hospital's medical staff, including Dr. Amernath, of Paul's dangerousness, of his bizarre attacks on his family members, and of the fact that he had been involuntarily transported to the ER after committing crimes at his home.  The pleadings also allege that the medical staff did not observe any substantial improvement in Paul's mental condition during his time in the hospital's custody, but rather continued to report to Dr. Amernath about Paul's violent outbursts.  Finally, the pleadings allege that the police requested to be informed prior to Paul's discharge so that they could make a determination at that time as to whether he should be arrested for his earlier violent acts.  Under these circumstances, it is plausible that a reasonable person would not have chosen to release Paul without first contacting the police.  Accordingly, Dr. Amernath's motion to dismiss on this basis is rejected.

### ii. **Hospital Defendants**

The hospital defendants' duty argument fares no better.  Like Dr. Amernath, the hospital defendants insist that New York case law forecloses the possibility that a hospital could owe any duty to non-patient third parties like the decedents.  Plaintiffs respond that the circumstances of this case gave rise to a duty running from the hospital defendants to the decedents.

Plaintiffs are correct.  Although the claims against the various non-physician hospital defendants appear to be more accurately characterized as simple negligence rather than medical malpractice, they survive dismissal at this early stage.  As with Dr. Amernath,

plaintiffs have plausibly alleged that the hospital defendants owed a duty to control Paul under the particular circumstances of this case or that they failed to notify the police of Paul's imminent discharge.

It bears repeating that plaintiffs' allegations are not based on some form of a normal, voluntary outpatient situation. The facts are thus distinguishable from <u>Citera v. County of Suffolk</u>, the case on which the hospital defendants' motion primarily relies. 945 N.Y.S.2d 375 (N.Y. App. Div. 2d Dep't 2012). There, decedent's mentally ill son Sancimo was receiving ongoing outpatient treatment from a psychiatric health facility. <u>Id</u>. When the mental health facility learned that Sancimo had crashed a family birthday party and acted erratically, it dispatched a psychiatrist to visit Sancimo at his home the next day. <u>Id</u>. After conducting an evaluation, the psychiatrist concluded that Sancimo "was stable and did not need a further evaluation or psychiatric admission." <u>Id</u>. Unfortunately, the day after that, Sancimo unexpectedly killed his mother. <u>Id</u>. On those facts, the <u>Citera</u> Court reversed a denial of summary judgment to the outpatient mental health facility, reasoning that the facility had established it lacked "the necessary authority or ability to exercise" control over Sancimo and that there was no other special relationship between the decedent on the treatment facility. <u>Id</u>.

In this case, however, plaintiffs allege that the hospital and its medical staff assumed control over Paul after the police delivered him to the ER. The pleadings further allege that these defendants were aware of the circumstances under which the police chose to bring Paul to them, yet for some reason failed to take a proper patient history, conduct an evaluation of his mental condition, or otherwise appropriately handle him. As a result, the hospital defendants mistakenly released him into the community without notifying the police,

resulting in death to Paul's immediate family members, some of whom allegedly requested mental help for Paul in the first place. Crediting these allegations as true and applying the generous 12(b)(6) standard, the complaints survive the motion to dismiss. See, e.g., Winters v. N.Y.C. Health & Hosps. Corp., 636 N.Y.S.2d 320, 320-21 (N.Y. App. Div. 1st Dep't 1996) (reviving for trial negligence claim based on "hospital's decision to release the psychiatric patient who later killed plaintiff's decedent" because, inter alia, "it is not clear whether there was a careful psychiatric examination of the patient" conducted prior to release).

In fact, Fox v. Marshall, the other case on which these defendants rely heavily, reaches a similar conclusion. As discussed above, in Fox a mentally ill defendant obtained a temporary pass to leave a residential mental health treatment facility and returned home, where he brutally murdered his neighbor. 928 N.Y.S.2d at 317. In partially denying the facility's motion to dismiss, the Court concluded that the plaintiff had adequately stated a cause of action sounding in negligence against the facility defendants because they were on notice of defendant's "severe psychological problems" and "exercised a certain level of authority and control" over him. Id. at 322 (finding "the complaint herein sufficiently alleges a cause of action in negligence" against those defendants).

So it is in this case. Plaintiffs have adequately alleged that the hospital defendants exercised authority and control over Paul, who was not free to leave until he was discharged by these defendants. Indeed, New York law establishes that mental health providers "have mechanisms by which to seek to control patients, including outpatients, who are a threat to themselves or others." 191 F. Supp 2d at 422-23.

Further, plaintiffs have also pleaded a claim for negligence against these defendants based on their alleged failure to inform the police that Paul was about to be

released.  Among other things, the pleadings allege that the police informed the hospital's medical staff of Paul's dangerousness, of his bizarre attacks on his family members, and of the fact that he had been involuntarily transported to the ER after committing crimes at his home.  The pleadings also allege that the hospital defendants did not observe any substantial improvement in Paul's mental condition during his time in the hospital's custody, but rather continued to report on his violent outbursts.  Finally, the pleadings allege that the police requested to be informed prior to Paul's discharge so that they could make a determination at that time as to whether he should be arrested for his earlier violent, criminal acts.  Under these circumstances, it is plausible that a reasonable person would not have chosen to release Paul before speaking to the police.

Finally, to the extent the hospital defendants argue in their reply brief that dismissal of one or more of the non-physician individual defendants is warranted, that argument is also rejected at this stage.  Although it is true that § 9.39 permits only a "staff physician" to make a commitment determination, it is entirely unclear at this stage what authority or control hospital policy might have vested in other defendants or, for that matter, what involvement other defendants may have actually had in the discharge/detain decision.  See Ben, 160 F. Supp. 3d at 480 ("Where the defendant has less-than-complete control over the third person, the duty may be more limited, but does not disappear completely.").  Accordingly, the hospital defendants' motion to dismiss on this basis is rejected.

### 2. Intervening Intentional Act

"An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be

reasonably attributed to the defendant." Kush v. City of Buffalo, 59 N.Y.2d 26, 33 (N.Y. 1983).  "While foreseeability is generally an issue for the fact finder, where only one conclusion can be drawn, proximate cause may be decided as a matter of law." Bell v. Bd. of Educ. of City of N.Y., 90 N.Y.2d 944, 946 (N.Y. 1997).

As the case law discussed at length above in disposing of the duty arguments makes clear, liability to foreseeable third parties, like household family members, for the violent acts of the mentally ill can attach to medical providers under certain circumstances.  Under the total circumstances pleaded in this case, whether Paul's violent acts against his live-in family members were foreseeable cannot be decided as a matter of law.  Accordingly, the medical defendants' arguments in favor of dismissal on this basis is rejected.

### 3. **Indispensability**

The hospital defendants further move to dismiss under Rule 12(b)(7) based on plaintiffs' failure to join Paul in this consolidated action.  According to the hospital defendants, Paul is a "necessary party" because they may have claims for contribution against him.  Plaintiffs respond that defendants have no viable contribution claims against Paul because the injuries arise out of defendants' own acts of negligence.

Rule 12(b)(7) provides a mechanism for dismissal where the plaintiff has failed to join a party required by Rule 19.  FED. R. CIV. P. 12(b)(7).  Under Rule 19, a court determining whether dismissal is warranted must first examine whether the absent party is required in the suit.  FED. R. CIV. P. 19(a).  A person is "required" under Rule 19 if:

> (A)    in that person's absence, the court cannot accord complete
>          relief among existing parties; or
>
> (B)    that person claims an interest relating to the subject of the
>          action and is so situated that disposing of the action in the

person's absence may:

(i)    as a practical matter impair or impede the persons' ability to protect the interest; or

(ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED R. CIV. P. 19(a).

If the absent party meets one or more of these requirements but cannot be joined for jurisdictional or other reasons, the court must then determine whether the absent party is "indispensable" under Rule 19(b). Fed. Ins. Co. v. Siphoned, Inc., 758 F. Supp. 2d 251, 257-59 (S.D.N.Y. 2010) (discussing Rule 19 analysis). "To be clear, a party cannot be indispensable, and a case cannot be dismissed for failure to join an indispensable party, unless it is a required party under Rule 19(a)." Id. at 259.

The hospital defendants argue Paul is indispensable because they "anticipate[ ]" that they "will have claims for contribution" against Paul. "Rule 19 does not require joinder of persons against whom a defendant may have a claim for contribution." Candle Kraft Corp. v. Euro-Asia Dev. Grp., Inc., 1997 WL 642350, at *7 (E.D.N.Y. Sept. 8, 1997); see also In re Great Atl. & Pac. Tea Co., Inc., 467 BR 44, 54 (S.D.N.Y. 2012) (approving out-of-circuit opinion holding that "Rule 19(a) does not require joinder if the absent party may later be held responsible for contribution or indemnification" against "joint tortfeasor or co-conspirator").[9] Accordingly, this argument is rejected.

---

[9] Rule 19's indispensability analysis is concerned with circumstances where a party *should* participate in the action but subject-matter jurisdiction, venue, or other roadblocks exist. Only in such cases is a court's duty triggered to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." FED. R. CIV. P. 19(b).

**C.** <u>**Security Defendants**</u>

Finally, the security defendants have also moved to dismiss plaintiffs' negligence claims against them.  These claims are based on Security Guard Roe's alleged involvement in restraining Paul upon his arrival at the ER and being present to observe his ongoing violent behavior.[10]  Among other things, plaintiffs allege that Securitas's employee failed to:  (1) advise UPD about Paul's imminent discharge; (2) advise the medical staff of Paul's continued bizarre behavior; and (3) ensure that police and the hospital's medical staff took appropriate action with respect to Paul, including preventing Paul's release from the hospital.

The security defendants argue that Securitas is merely the security services contractor for the hospital and that its employee had no control over Paul—the police and the medical staff were the only entities with authority to decide whether to detain or to discharge him.  Further, the security defendants argue that any alleged breach of the security services contract between Securitas and the hospital does not give rise to a duty in tort running to the decedents.  Plaintiffs respond that Security Guard Roe had at least the partial ability to control Paul's conduct; in addition, Roe could possibly have prevented Paul's discharge by accurately reporting to his co-defendants about the serious, ongoing nature of Paul's mental condition or reporting his imminent discharge to the police.

Essentially, plaintiffs' complaints assert that the security defendants failed to control Paul, a third party known to have dangerous propensities.  In such cases, "the two requirements for triggering this duty are:  (1) sufficient knowledge of the danger posed by the third person; and (2) sufficient ability to control the relevant conduct of the third

---

[10]  The pleading uses the placeholder Roe for an unidentified security contractor.

person." <u>Ben</u>, 160 F. Supp. 3d at 478.

Plaintiffs have plausibly alleged that the security defendants had a duty to control Paul to survive dismissal at this stage.  Plaintiffs allege that Security Guard Roe, who participated in restraining Paul during his involuntary intake, had direct knowledge of Paul's dangerousness and an awareness of the circumstances under which Paul had been brought into the ER.  And although the security defendants are correct to note that plaintiffs' allegations of control focus primarily on the medical defendants, the allegations in the complaint, liberally construed, indicate that Security Guard Roe had at least some ability, as an agent of the hospital's designated security provider, to control whether Paul was released from the facility and, if released, under what circumstances, i.e., to the police.  <u>Cf</u>. <u>Ben</u>, 160 F. Supp. 3d at 481 ("Where the defendant has less-than-complete control over the third person, the duty may be more limited, but does not disappear completely.").  The extent and limitations of Roe's ability to control the situation are issues for discovery, not a motion to dismiss.  Accordingly, the security defendants' motion to dismiss will be denied.

## V.  <u>CONCLUSION</u>

The tragedy at issue in this case may have been the result of a completely unforeseeable break with reality that Paul suffered following his discharge from the hospital that evening.  But because the allegations in the complaints plausibly suggest otherwise, this case must go forward.

Therefore, it is

ORDERED that

1.  The police defendants' motions to dismiss are DENIED;

2.  The EMS defendants' motions to dismiss are GRANTED;

- 46 -

3.  Dr. Amernath's motions to dismiss are DENIED;

4.  The hospital defendants' motions to dismiss are DENIED;

5.  The security defendants' motions to dismiss are DENIED; and

6.  The complaints are DISMISSED as against defendants Adrian Irizzary, Brian

Devins, and the City of Utica's Fire Department Emergency Medical Services.[11]

7.  The remaining defendants shall file and serve answers to the complaints on or

before January 23, 2017.

IT IS SO ORDERED.

Dated: January 3, 2017
        Utica, New York.

United States District Judge

---

[11]  These names shall be removed from the caption of all future filings.